FRANKLINTON COALITION ET AL., APPELLEES, v. OPEN SHELTER, INC., APPELLANT; CARVER ET AL., APPELLEES.

FRANKLINTON COALITION ET AL., APPELLANTS, v. OPEN SHELTER, INC. ET AL., APPELLEES.

*Messrs. Porter, Wright, Morris & Arthur, Mr. Michael K. Yarborough, Mr. Robert A. Meyer, Jr.,* and *Mr. Michael Morrissey,* for Franklinton Coalition.

*Mr. Paul H. Coleman,* for Open Shelter, Inc.

*Mr. Clarke Fahnenbruck,* for Lin Carver.

WHITESIDE, P.J. In case No. 83AP-230, defendant Open Shelter, Inc. appeals from a judgment of the Franklin County Court of Common Pleas granting an injunction against the establishment by defendant of a shelter for the homeless upon the ground that such use would be in violation of the zoning established by the Columbus City Code. Defendant raises a single assignment of error, as follows:

"The court below erred in its determination that the proposed facility was not in conformance with the Columbus City Code."

In case No. 83AP-272, plaintiffs Franklinton Coalition et al. have appealed and raise two assignments of error, as follows:

"1. The trial court erred in failing and refusing to enjoin as a nuisance defendant's proposed establishment and operation of a shelter in Franklinton.

"2. The trial court erred in failing and refusing to enjoin the expenditure of public funds by the defendant for a shelter."

The other defendants named as parties in the two complaints, officials of the city of Columbus, have neither appealed nor made an appearance in this court.

Defendant Open Shelter, Inc. ("Open Shelter") is a corporation not-for-profit organized pursuant to R.C. Chapter 1702 which seeks to operate a shelter facility

for homeless people in the downtown Columbus area. Defendant did operate such a shelter at 246 South High Street until the site became unavailable for use. Thereafter, defendant obtained a lease upon an empty warehouse in the Franklinton area at 370 West State Street and applied to the city of Columbus for the appropriate permits to remodel the warehouse, which was located in an area zoned C-4 commercial. City officials did not immediately grant the permits; instead, they required revision of the plans so as to provide for six sleeping rooms in the former warehouse and then issued a certificate of zoning clearance. Funding for the project is part public and part private, one-third of the funding coming from each of the city of Columbus, Franklin County and private sources.

Thereafter, plaintiffs brought this action seeking to enjoin utilization of the premises for the purpose of providing a shelter for the housing, feeding and care of indigents, contending that it: (1) would constitute a nuisance; (2) would violate applicable zoning ordinances; and (3) would involve a misuse of public funds. After an extended trial at which much evidence was adduced, the trial court denied the injunction upon the grounds of nuisance and misuse of public funds but granted an injunction against operation of the facility upon the ground that it would be in violation of the applicable zoning, specifically finding that the only possible permitted use would be as a hotel and that the intended use did not constitute a hotel.

At the outset of its argument in support of its single assignment of error, defendant contends that plaintiffs have no standing to raise the issue involved. While there is considerable doubt as to the standing of plaintiff Franklinton Coalition to bring an action pursuant to R.C. 713.13, the other plaintiffs clearly have standing, being property owners in the vicinity of the proposed use who contend they will be especially damaged by the alleged violation of zoning. R.C. 713.13 provides that: "* * *[T]he owner of any contiguous or neighboring property who would be especially damaged by such violation, * * * may institute a suit for injunction to prevent or terminate * * *" a zoning violation.

The building in question is located in an area zoned C-4 commercial, which is one of the least restrictive zoning districts permitting numerous and various commercial uses on a community scale commercial development. Also permitted in a C-4 commercial district are the uses permitted in more restrictive commercial districts, known as C-1, C-2 and C-3 commercial districts. A hotel is a permitted use in a C-4 commercial district by virtue of this provision, since a hotel is a use expressly permitted in the more restricted C-3 commercial district. See Columbus Code (C.C.) 3355.01 as to C-3 commercial districts and C.C. 3355.02 as to C-4 commercial districts. In all of the commercial districts, residential use is permitted by apartment facilities which may be constructed over storerooms. See C.C. 3351.01(b) and 3353.01(b).

While there was extensive evidence as to the manner in which the former facility on South High Street was operated (primarily under a prior director), there was little evidence as to the proposed use of the building in question other than that the building will be used as a shelter for homeless people who will also be provided food. Six rooms are to be provided for the purpose of sleeping accommodations in dormitory style. No fee is charged for use of the accommodations, nor is any limitation imposed as to the duration of the stay at the facility by a particular resident. The residents are permitted to stay at the facility throughout the day, rather than being limited to the evening hours. A security guard will be employed to patrol the outside area and specifically the adjacent driveway leading into the parking lot of plaintiff Spaghetti Consultants for the protection of its patrons going to the Spaghetti Warehouse Restaurant which it

operates. There also would be a staff member on duty inside at all times, who would be assisted by volunteer staff.

For zoning purposes, the city of Columbus has elected to specially define the word "hotel" to have a special meaning, which may well vary from the ordinary meaning of the word, C.C. 3303.01 providing that: "For the purposes of this Zoning Code, the following terms, phrases, words, and their derivations shall have the meaning given herein. * * *'' Thus, C.C. 3303.38 defines "hotel," as follows:

" 'Hotel' or 'Motel' means any building, or part of a building, in which six (6) or more rooms are designed, intended to be used, or are used for the purpose of providing sleeping accommodations for transient guests. * * *''

This varies considerably from the ordinary conception of a hotel as a multistory building containing many rooms offered for hire as accommodations for overnight guests, usually also providing eating and drinking facilities and entertainment. See Webster's Third New International Dictionary. On the other hand, the American Heritage Dictionary defines "hotel" simply as: "A public house that provides lodging and usually board and other services."

While recognizing that the evidence indicated that the building in question did contain at least six rooms intended to be used for the purpose of providing sleeping accommodations, the trial court found that the accommodations were not going to be provided to guests and that some of the persons to whom accommodations would be provided were not transient. To reach these conclusions, the trial court found that, as a matter of law, the word "guest" necessarily means that some type of payment or compensation will be required. This was erroneous. While the word "guest" includes one who pays for services of a restaurant, hotel or similar establishment, it also may include a per-

son who receives such service without payment therefor.

The trial court next turned to a definition in the Columbus Taxation Code to define "transient" as one who stays at a hotel no longer than thirty days. Thus, the trial court adopted the definition of C.C. 371.01, which provides that:

"As used in this chapter:

"* * *

"(c) 'Transient guests' means persons occupying a room or rooms for sleeping accommodations for less than thirty consecutive days.

"* * *''

However, that same section provides in paragraphs (a) and (b) as follows:

"As used in this chapter:

"(a) 'Hotel' means every establishment kept, used, maintained, advertised or held out to the public to be a place where sleeping accommodations are offered to guests, in which five or more rooms are used for the accommodation of such guests, whether such rooms are in one or several structures.

"(b) 'Transient Accommodation' means every establishment kept, used, maintained, advertised or held out to the public to be a place where sleeping accommodations are offered to guests in which four or less rooms are used for the accommodation of such guests, whether such rooms are in one or several structures.

"* * *''

C.C. 371.02 imposes the same tax upon both hotels and transient accommodations but provides that: "* * * The tax does not apply to lodging furnished to * * * any charitable organization for the lodging of transient indigent individuals * * *.'' Application of this definition to "hotel," as used in the zoning code provisions indicating a hotel to be a permitted use in a C-3, and thus a C-4, commercial district, is clearly erroneous, inasmuch as it is inconsistent both with the definition of "hotel" in C.C. 3303.38 as well as the general definitional explanation of C.C. 3303.01.

Even if the definition of C.C. 371.01(c) be adopted, the proper result does not vary. Under the Columbus Zoning Code, a building is a hotel if it contains six or more rooms intended to be used to provide sleeping accommodations to transient guests. The zoning code does not require that this be the sole use made of the building. In other words, if six rooms are used to provide sleeping accommodations for transient guests, the building is a hotel even though it may also contain accommodations for permanent residents. As the trial court expressly found, with respect to the operation of the shelter on High Street, at least one-third of the persons for whom accommodations were provided were, in fact, "transient" as defined by the trial court. Actually, a more fair reading of the evidence indicates that a majority was transient, even under the trial court's definition. Therefore, if the six rooms are offered as sleeping accommodations to these transient guests, it is a hotel under the Columbus Zoning Code, even though it may also be some other type of facility.

However, the definition of the term "transient" given in the Columbus Taxation Code does not apply to the zoning code, and the words "transient guest" must be given their ordinary meaning. "Transient" means temporary, as opposed to permanent. In reference to hotel guests, it connotes remaining only for a short time, with no definite arrangements as to duration of stay, at least in reference to a guest at a hotel. Ordinarily, the accommodation would be on a day-to-day basis but may be extended. The fact that the total durational stay is more than thirty days does not necessarily prevent the guest from being a transient guest if the stay is on a day-to-day basis with a definite intent to leave in the near future. Thus, one remaining for two or three months may still be transient if the guest was a person who passes from one place to another, staying only on a day-to-day basis at the building in question.

The overwhelming evidence in this case is that the persons for whom sleeping accommodations were intended to be provided would qualify as transient guests because of the usually short, indefinite duration of their stays on only a day-to-day basis. Interestingly, one of the definitions of the noun "transient" in Webster's Third New International Dictionary is "an often homeless person traveling about usually in search of work or a living." Except possibly as to their purpose and intent, this describes the persons to whom defendant intends to provide sleeping accommodations. There is, furthermore, no indication in the record that the survey upon which the trial court relied was scientifically conducted. Interviews were on a voluntary basis over a two-month period, with the total number of persons being interviewed approximately equal to the average daily population of the facility on South High Street. There is no indication as to whether a long-time resident of the facility was more likely to volunteer to participate in the survey than a resident who remained only a night or two. Regardless, as we have indicated, it is not necessary that all residents be truly transient, whatever the definition of "transient," so long as six rooms are offered or intended to be used as sleeping accommodations for "transient guests," however that term may be defined. Here, there can be no question from the testimony that this is the intent.

As we noted previously, the trial court erroneously assumed that payment for the sleeping accommodations is a necessary element of the definition of "hotel" for zoning purposes. The Columbus Zoning Code contains other definitions which give insight to the legislative intent. C.C. 3303.09 defines "boarding house" as: "* * * [A] residential building, other than a hotel, in which meals are served together with lodgings for hire to three or more persons." Here, the code expressly requires that the lodging be furnished for hire and that some hotels

would meet this definition. Similarly, C.C. 3303.73 defines "rooming house" as: "* * * [A] residential building, other than a hotel, in which part or parts are kept, used or held out to be a place where sleeping accommodations are offered for hire for three or more persons." Again, the definition is very similar to the definition of "hotel," except that, as to a "rooming house" or "boarding house," the sleeping accommodations may be offered for hire to as few as three persons, and those buildings meeting the definition of "hotel" are excepted. Thus, in those instances where it was felt that payment for the accommodations was a necessary element of the definition, the words "for hire" were included. With respect to "hotel," however, the words "for hire" or words of similar import are omitted.

The trial court apparently relied heavily upon the response of Councilman Mentel to a question asked by the court on cross-examination to the effect that the facility does not meet the ordinary definition of "hotel." No response given as to whether it constitutes a hotel under the Zoning Code, the trial court specifically limiting the answer to the way one would "look at it in the common-sense manner." The councilman stated: "Hotel, I view as someone paying money to go in and get him an individual room." The councilman then gave an affirmative answer to the trial court's inquiry as to whether the facility would be more like a dormitory than a hotel. Of course, from all the evidence adduced, there can be no doubt but that the facility is also a dormitory within the definition of C.C. 3303.20, which defines "dormitory" as: "* * * [A] building arranged, intended, or designed to be occupied by unrelated persons as either individuals or groups who occupy common sleeping rooms and share related facilities such as bathrooms and washrooms. * * *" However, the fact that the facility is a dormitory does not preclude it from being a hotel as well.

In other words, putting the two definitions together, i.e., "dormitory" as defined in C.C. 3303.20, and "hotel" as defined in C.C. 3303.38, a building is a "hotel" as well as a "dormitory" if it contains six or more rooms designed or intended to be used to provide sleeping accommodations for transient guests who are either individuals or groups who occupy common sleeping rooms and share related facilities such as bathrooms and washrooms. The definitions are not mutually exclusive. While not every dormitory is a hotel, nor every hotel a dormitory, a hotel furnishing sleeping accommodations in dormitory style, as defined in the Columbus City Code, is a dormitory as well as a hotel. Unfortunately, the Columbus City Code is not entirely clear as to which districts such a facility may be located in, since a dormitory is a permitted use in an AR-1 apartment residential district, but a hotel is not. Alternatively, a hotel is a permitted use in a C-3 commercial district, but a dormitory is not specifically mentioned. Nor is a hotel furnishing accommodation in dormitory fashion a prohibited use in the city of Columbus. See C.C. 3387.01 which lists the prohibited uses.

As noted previously, a certificate of zoning clearance was issued by the city of Columbus pursuant to C.C. 3305.01 with respect to the proposed alteration and use. C.C. 3305.03 provides that: "A Certificate of Zoning Clearance authorizes only the use and plans set forth in the application. * * *" Such an administrative determination should be given deference by the courts, and a contrary result reached only if the administrative determination is clearly erroneous under the applicable ordinances. Here, the administrative determination is consistent with the Columbus Zoning Code, so long as the actual operation of the facility is as a hotel, as defined by C.C. 3303.38.

Since the intended use of the building by defendant Open Shelter is not in violation of the Columbus City Code, the trial court erred in granting the injunction.

Defendant Open Shelter's assignment of error is well-taken. This conclusion, however, does not preclude a future action if actual operation violates existing zoning.

By their first assignment of error, plaintiffs contend the trial court erred in refusing to enjoin the proposed establishment and operation of a shelter as a nuisance. There was ample evidence supporting the trial court's finding that the operation of the shelter by defendant on South High Street constituted a nuisance. Testimony by the former director of Open Shelter, Witte, as well as testimony of other witnesses, indicates that a nuisance was created by operation of the shelter on South High Street during that director's tenure. Not only has there been a change of directors, but also witnesses testified that the proposed operation would be modified sufficiently to attempt to avoid the creation of a nuisance, including the provision for a security guard as mentioned above. The evidence supports the trial court's finding that: "Based on the record at this time, it is, however, not at all clear that the evolving operations of defendant will pose the same kind of problems that may have been imposed in the past." The findings of the trial court that an open shelter can be operated and not constitute a nuisance are supported by the evidence. In short, there was insufficient evidence to require the trial court to find that the operation of the shelter for homeless persons by defendant would necessarily constitute a nuisance at the new location merely because it did constitute a nuisance at a former location. As the trial court noted, there was evidence that "operations of the facility are an evolving process, and substantial changes are planned for the future operation of the facility." The trial court's findings are further supported by the existence of three other shelters operating within the city of Columbus, *i.e.,* Faith Mission, Salvation Army and Volunteers of America, all of which apparently do not constitute a nuisance, although at least some of them do not provide shelter during the day and, which the trial court found, often have unused beds available. Of course, the judgment does not prevent plaintiffs from bringing a new action if actual operation of the shelter by defendant results in the creation of an actual nuisance. Plaintiffs' first assignment of error is not well-taken.

By their second assignment of error, plaintiffs contend that the trial court erred in denying injunctive relief against the expenditure of "public" funds by defendant for the shelter. Plaintiffs correctly point out that the trial court found that "[p]ublic expenditures of funds by a political subdivision in partnership with a private corporation is [*sic*] a misuse of public funds" and that "[t]he city and county are, in effect, partners in a private enterprise but using taxpayers' money." The court further indicated, however, that it found it to be within the powers of both the county and city "to operate an open shelter house as part of their powers to promote the public health, welfare and safety." Nevertheless, the trial court refused to grant an injunction against expenditure of public funds because "[t]he court feels that it cannot issue an injunction against an expenditure of funds by either political subdivision if they are not parties to this lawsuit." The obvious answer, however, is that if they need to be parties, they should be joined as parties. There is no indication, however, that plaintiffs made any effort to join the city or the county either before or after the trial court's judgment. We share the trial court's concern both with the absence of any contract between the county and Open Shelter and with the provisions of Section 6, Article VIII, Ohio Constitution. However, it is appropriate for a political subdivision to contract with a nonprofit corporation to provide services to the inhabitants of the political subdivision that could be provided by the municipality itself as a public service. Such a contract

existed between the city and defendant Open Shelter, but no such contract existed between the county and Open Shelter. Nor does the fact that the source of funding may be federal general revenue sharing funds relieve political subdivisions of their obligation to adhere to Ohio law regarding their authority and procedure. Nevertheless, we find no error or abuse of discretion on the part of the trial court in refusing the requested injunction.

First, in large part, the issues are moot. Insofar as payments by the county to defendant, the evidence indicates they have been made. Any injunction would be against expenditure by the city and county, not by defendant. Defendant is not a public agency and there is no evidence that defendant is in partnership with either the city or county, as found by the trial court. Rather, there is evidence of public funds being given to a nonprofit corporation to perform a service considered to be beneficial to the public generally, with the understanding that it was lawful to do so. Even assuming it to be unlawful, monies paid under mistake of law cannot be recovered. See *State, ex rel. Dickman,* v. *Defenbacher* (1949), 151 Ohio St. 391 [39 O.O. 221]. See, also, *State, ex rel. Leaverton,* v. *Kerns* (1922), 104 Ohio St. 550.

The trial court neither erred nor abused its discretion in denying injunctive relief. Since no relief was sought against the political subdivisions, payments made by them in the past are not recoverable by plaintiffs even if made under a mistake of law, and there is no evidence supporting a finding of a partnership between defendant and the city and county. Rather, the evidence indicates that defendant, a nonprofit corporation, performs a function which could also be performed by a public agency, that the city has contracted with defendant to provide such services, and that the county has provided funds to defendant for the performance of such services, but there has been no joint

ownership or operation of any facility. Plaintiffs' second assignment of error is not well-taken.

For the foregoing reasons, defendant's assignment of error is sustained, and plaintiffs' assignments of error are overruled. The judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court with instructions to enter judgment for defendant.

*Judgment reversed and
cause remanded.*

STRAUSBAUGH and REILLY, JJ., concur.